Good morning ladies and gentlemen. Our first case for this morning is Orr v. Shicker. And Mr. Rupchit, should we start with you? Thank you, Your Honor, and may it please the Court. Federal rules of civil procedure require a plaintiff seeking class certification to prove four elements under Rule 23a and an additional element under Rule 23b. The Court is then required to conduct a rigorous analysis of the evidence marshaled by the plaintiff and the defendant to arrive at a decision either granting or denying class certification. This is in recognition of the high stakes of class action litigation. In this case, the plaintiff did not meet any of the elements under Rule 23a and failed to meet an additional element under Rule 23b. Therefore, the District Court erred when it granted class certification in this case on an insufficient record and based upon an order in which the District Court made no factual findings on the issue of class certification. So is that your real problem that the District Court didn't spell it out in its opinions or is your problem that the underlying record doesn't show the criteria of Rule 23a and b satisfied? Well, fundamentally, it's that the record does not support class certification. So we know that there are at least some evidence in the record that there are 2,000 people give or take in the Illinois Department of Corrections who would test positive for the Hepatitis C virus. Approximately 10% of the population at any given time would be Hepatitis C positive. Right. And then actually in the District Court's earlier opinion, he goes through quite a bit of conflicting medical evidence. I would describe it as some people thinking that it's okay to wait until some of the tests are measuring like the fibrosis level test gets up to F3. Others saying no, you really, you know, standard of care at this point. I don't know if that goes so far as to say it would be deliberately indifferent not to treat immediately, but the judge at one point comments that over the 11 years he's been supervising this case, medicine has moved along quite a way. There's no question about that. It went from in the mid-2000s to an interferon, basically like a chemotherapeutic agent, and has advanced and this case has sort of dragged along with the advancements in medicine. You know, the case started out well before the direct acting antivirals were even on the market. So there's certainly the record is ripe with conflicting medical evidence, medical evidence that's irrelevant at the current state of the medicine. I would say that advances in medicine typically are not made under the Eighth Amendment, at the point of an Eighth Amendment sphere where we, I guess, track the advances in a pending case as they happen and order them as a matter of constitutional law. Isn't it obvious who the judge was thinking the class representatives were when he identifies these particular cases that have been before him that Mr. Heller has been representing the named plaintiffs in? I mean, who else would it be other than the named plaintiffs in these cases, such as, for example, Jeffrey Orr? Well, Judge, each of the consolidated cases, I believe there's four, have hundreds of named individual plaintiffs. So this isn't a situation where typically we have a representative seeking to bring a class action on behalf of unnamed people. We have upwards of 2,000 people seeking individual damages as named party plaintiffs. So to say that they were intended to be the class representative, I don't know who to fish out of that 2,000 people or whose case we would try as the representative. Let's talk a little bit about your requested relief. You're seeking remand with instructions to dismiss the claim. Is it possible, if we don't completely agree with you, to make a dismissal or have a remand for purposes of the class rep, but still have other aspects of the class action continue? When you say dismissal, what we seek is decertification of the class. Is that what you mean? Right. What I'm thinking is that there's going to be less of an onerous outcome, something that might be in the middle. What is your position on some of that? Well, my position is that the elements weren't met on any, the facts don't support the elements on any of the 23A or B. So a limited remand, as to a particular commonality, typicality, that's what the court's asking. I'm not familiar with case law that would suggest either way. I suppose I don't see a reason the court couldn't carve out certain elements for remand. But given the state of the record in this case, it being an 11-year-old case, we need to get down to business of sorting out these 2,000 individual claims. Let me ask you this. This is one of the things that's always struck me as notable about class actions. If this proceeds as a class action, I'll just say hypothetically with Mr. Orr as the class representative, there's a fairly well-organized way that we now handle them. Class actions are a pretty mature procedural mechanism, at least since 1966 when the rule was changed. It sounds like the alternative here would be the joinder of 2,000 individual cases against the Illinois Department of Corrections in Wexford, I assume. I'm not worried about them right now. But is that better for you? That's a little bit like what happens in MDLs, right? You get a huge number of cases consolidated. The court will pick one or two representative cases to try as bellwethers and on we go. Usually there's a settlement at that point. Is that a better way of handling this? I'm not sure there's an option here given the individual nature of every plaintiff's damages claim. Whether there's a certification under 23B2 for injunctive relief, which this is for, we still have to deal with every one of those. But there are commonalities, surely. They have hep C. The common question, I guess, at what level is a treatment protocol so lacking that it actually meets the deliberate indifference standard? I don't know. I think there certainly isn't a clearly named representative. I'll give you that. I'm not sure about the other 23A criteria. But anyway, I think your time is up. And if you'd like to give some of it to Ms. Schoenberg. Thank you. Good morning, and may it please the court. I'm Assistant Attorney General Caitlin Schoenberg, and I represent the State Defendants' Appellants. In January 2019, the Illinois Department of Corrections implemented its newest protocol containing guidelines for treating inmates with hepatitis C. That protocol recognized that recommendations for treatment of hepatitis C change frequently. Indeed, the department updated its protocol to expand treatment for inmates with FibroScan scores of 2 or greater after the district court suggested that it do so. Nonetheless, 11 years after this case was first filed, the district court granted in part plaintiffs' motion for a preliminary injunction. Even though on page 8 of that order, it also found that there was nothing in the January 2019 protocol that indicated a deliberate intention to ignore the effects of the disease or to deliberately harm the prisoners or consciously expose them to a serious risk of harm. The portions of the district court's order that granted plaintiffs' request for preliminary injunctive relief should be reversed and vacated for several reasons. First, the 11th Amendment barred prospective injunctive relief because there was no continuing constitutional violation. Well, I mean, I guess that's the answer to the question. You would agree that the 11th Amendment is not a bar to exclusively prospective relief against a state of, you know, the ex parte young scenario, basically. Correct, where there is a continuing constitutional violation. And isn't there argument that without these tweaks, I mean, again, I certainly am not taking a position on this right now, but I understand them to be saying that without these tweaks that the district court gave to your January 2019 protocols, this still fell short. Now, I have certainly some questions from Mr. Heller about what's the difference that that's important, let's say, with the Class 2, which is for the fibrosis level of greater than or equal to 2. These are people you're referring to UIC, as I understand it. Correct. Yes, correct. And so the only question seems to be when you refer them, well, first of all, there's he's added this additional APRI score greater than .7, and he seems to be saying UIC needs to treat them unless it has some reason not to, as opposed to just exercising its medical judgment. I'm not really clear what the difference is. I believe under the protocol that inmates are to be referred to UIC for the physicians at UIC to determine the appropriate course of treatment. And at the beginning of the protocol in the first few paragraphs, it spells that out, that the decision to provide treatment will be made by the physicians at UIC. And so certainly if a physician at UIC felt that for some reason a particular inmate should not receive treatment, that would be the decision for the UIC physician to make. But that's basically the state's position, too, right? I mean, I'm just trying to get at what is the district judge added that's important to you in this preliminary injunctive order? Well, I would add, first, and this leads me to my second argument, which is that the district court's order violates the PLRA because in addition to essentially ordering the department to follow its own protocol, it added these, as you described, these few tweaks, and specifically the addition of two requirements that inmates be screened for hepatitis C within three months of being received into department custody, and then the treatment begin within three months of the hepatitis C diagnosis. Remind me, was this order stayed? It was, yes. Right, because otherwise it would have expired by its own language. Correct, yes. Yes, the order was stayed. So it's never gone into effect. That's correct, right. But the addition of these three-month time frames in the district court's order violates the PLRA because while delay in providing medical treatment may, in some instances, rise to the level of deliberate indifference, the length of delay that is constitutionally allowable depends on a particular inmate and the type of disease or harm that may be caused. And so in some instances, a short delay of even a few hours may rise to the level of deliberate indifference. In other instances, several months may not. And so there is no constitutionally mandated deadline by which inmates must receive this course of treatment. And in fact, during the testimony, during the evidentiary hearings in this case, there that this three-month deadline was necessary in order to stop further advancement. In fact, the testimony explains that hepatitis C is a slow-moving, slow-progressing disease and that even after 20 or 30 years, most individuals with hepatitis C won't progress to stage 4 or cirrhosis. Right, I'm familiar with that evidence. It seems to me, in principle, there could be hypothetical conditions where you would say if you haven't done anything about it and three months has elapsed, you are in the deliberate indifference form. So it's a tooth abscess or something where somebody's, you know, in agony because their tooth is bad. If you sat around and waited for three months, like the district court put that outer limit, I think we would all say, well, that's a reasonable outer limit. I think what you're saying is that the record for hepatitis C at least contains evidence on both sides, that there is evidence that suggests, as you just said, that it's a slow-moving disease. That's correct. And again, for similar reasons that the court, this court in Westerford v. Snyder, explains that where a preliminary injunction is entered that sets deadlines where none are constitutionally required, that runs headlong into the PLRA. And so here... Well, but you're... Whether they're constitutionally required might even be a question of fact. I mean, I can think of instances where delay in treatment is so extreme. I think you're making a more granular, factual argument that this isn't that case. That's correct. And again, it's dependent on each individual inmate whether or not a portion or some amount of delay might cause the harm that would be subject, that would heighten the issue to a deliberate indifference standard. And so for those reasons, and again, based on the state defendant's belief that there was no continuing constitutional violation, entering this preliminary injunction violated the PLRA. Aside from the 11th Amendment and the PLRA bars to this preliminary injunction, however, the district court's order should also be reversed and vacated because the plaintiffs did not establish the threshold requirements to establish preliminary injunctive relief. Again, the district court here found that the inmates or the plaintiffs did not have a better than negligible chance of establishing that failure to treat inmates with F0 and F1 FibroScan scores would amount to deliberate indifference. And as the state defendants argued in our briefs, the question of whether treatment should begin for inmates below the F2 standard is not presently before this court in these appeals because there's not a proper cross-appeal from that issue. But nonetheless, the district court did find that a decision not to treat those inmates, the plaintiffs had not established a likelihood of success that that would arise to the level of deliberate indifference. Go ahead. I was just going to say that's why I was trying to focus on this, what is the practical difference between what you're doing already for the F2 people and what the district court wants you to do? I think what the district court's worried about is that once there's enough scarring in the liver, it's not going to regenerate itself the way livers can do, I suppose, if the damage isn't bad enough, at least according to this record. But the judge is concerned that if you take this long wait and see approach, then you're going to get a transplant, which I'm sure the state doesn't provide. Well, so that also leads to a reason why preliminary injunctive relief was not necessary in this case. If that is the concern of the district court, of a potential delay in providing treatment to inmates, or perhaps that the January 2019 protocol still presents problems for when the consent decree that the department has entered into with the plaintiffs in that case. I thought that was a pretty generic consent decree that didn't drill down into hepatitis C with anything like the detail that this case does. So the consent decree does acknowledge that the department will allow a monitor to review and analyze the type of medical treatment that it provides to inmates for a variety of different medical ailments, including inmates with chronic disease like hepatitis C. And so the Lippert consent decree does not provide a specific course of treatment, but it does acknowledge that hepatitis C will be a type of disease that the monitors who are appointed in that case will be reviewing the department's treatment of inmates with hepatitis C, the protocol, and if there's any issues or problems with implementing those protocols. And so the monitor in the Lippert consent decree, and there has been a monitor that's been appointed at the time that state defendants moved to stay the proceedings in the district court in this case, alerting the district court to this pending consent decree. It had not yet been entered, but the Northern District approved the consent decree in May of this year. Monitors have been appointed, and they will be reviewing the department's protocol and treatment plans and staffing needs for a variety of treatment and diseases, including hepatitis C. And so this goes to another reason, the balance of harms analysis here, that preliminary injunctive relief was not needed or necessary in this case in light of the Lippert consent decree, which would allow a monitor to review the protocol and if there were issues with implementation or problems with the protocol itself. You're in your rebuttal time, you know. Well, oh, I will save the rest of my time for rebuttal then. Thank you. All right. Thank you very much, Ms. Chenevert. Mr. Heller. Thank you, Your Honor. May it please the court, counsel. Mr. Ropsitch and I have been dealing with this for a long time. He and I tried Roe versus Ilias in the district court, and then we've been on this case for 11 years, as Judge Baker pointed out. And during that course of time, 120 of the inmates with hepatitis C have died, about one a month. So in the three months that the court has allowed for all of these patients not to get treated for hepatitis C, we estimate that another three will die. And one will die every month because they're not being treated for hepatitis C. But that's a little more general. I mean, obviously, nobody wants this to happen. Probably the people who are dying needed to be treated quite some time ago. I guess I have a lot of questions for you, but one of them is didn't the district judge blow by the Rule 23 criteria way too fast? Because I'm thinking of cases, I think Wexford cites this. I don't know why the state didn't. But cases such as the General Telephone case saying, you've got to pay attention to the characteristics of the class representative, and we don't even know who this is. Well, first of all, there are 2,000 patients. That's fine. But, I mean, if you read Justice Stevens' opinion in General Telephone, they're there picking about, you know, can a Mexican-American who's complaining about promotion be a class representative for somebody who's complaining about hiring? And they say no. So we need to see who these people are. It is a little different in this case. First of all, this is a subset of the Lippert class that's already been certified that the state has identified. Well, I'll get into Lippert in a minute. But the point is, would somebody with an F3 be a good class representative for somebody who's F1, just for example? Well, it doesn't mean you can only have one class representative. You may well have to have an F2. We don't have any, though. But we do, because each of the individual plaintiffs is still a party to the suit. In a typical case, four or five people bring the suit, and then you examine whether or not they're qualified class representatives. In a typical case, the district judge says, Suzy Smith is proffered as the class representative. Let's look at her case. Let's look and see what happened to her. How does it match? What happened to the rest of the people? Are there potential conflicts between her and the others? And a whole bunch of inquiries like that. And then the district court certifies this individual. Sometimes they get extra payments because they're the class rep. And, of course, this is the second time we addressed the issue of class certification. There was a class certification hearing earlier where the court found commonality, where the court found that the numerosity test was met. With what representative? I don't believe that the court felt that any of the persons who met his criteria were not capable class representatives. But he doesn't tell us that. I mean, this is a new one to me. I've been thinking about class actions for years, and no named representative really discussed by the district court? Well, of course, as the justice pointed out, the court, you could remand for the sole purpose of identifying which of the individual plaintiffs would be the class representatives, and Judge Baker could pick. That wasn't what happened in Mann v. Ohio, which was decided in, I believe, June of this year, or in Post Taco, which was decided in September of this year, where these exact classes were certified. So this isn't something that's new or unusual. It isn't what necessarily happened in Florida or in Indiana in the Stafford case. We clearly have a group of people who have a problem. And as you pointed out, Your Honor, the option is give each plaintiff one day to present his or her claim, and we'll do it individually, and give the state half a day for rebuttal and cross-examination. And we will be trying these cases for the next 20 years, because there are 2,000 plaintiffs already. And quite frankly, from my clients, we have 2,000 people that have signed individually to be plaintiffs. The class certification doesn't help any of them. It doesn't help the 2,000 named plaintiffs that are before the court. What it helps is the people who didn't sign up for the case that the court is saying should be treated. So from the plaintiff's perspective, what we want is treatment. So, but your client, Mr. Orr, correct? Correct. I understand that Wexford has been dismissed in his case, although not in some of the other cases. They were dismissed in that case. So you're just suing the state. In the Orr case, that's correct. And the reason is, and you asked counsel about it, what is it that we want? In June of 2017, Judge Baker entered an order as we started this process, knowing that we'd come from interferon and ribavirin to the antiviral drugs. And the price of treatment had gone from $20,000 to $80,000. And Judge Baker said, you need to treat everybody as soon as possible, but not later than stage two. And 18 months later, the state still wasn't treating, even stage three. We still had people calling on a weekly and monthly basis. My husband is dying. My husband needs an organ transplant. And the Lippert Report talks about the fact that less than 1% of the people with hepatitis C were being treated, even right up until the time of the hearing. Now that you have the Lippert consent decree, especially, and now, I mean, the judge makes a remark about the January 2019 protocols that troubled me a bit, especially in light of Lippert, where he says, I still need to enter this injunction because I'm not sure that the state is going to stick with what it promised to do. Now, that's already a bit of a problem, given that I don't think we presume bad faith on the part of the states. And it seems to me it's doubly a problem, given that the umbrella Lippert consent decree does include hep C. Well, I guess the question is, do the people who have hep C have a right to insist on treatment? And they've already had the hearing. They've presented the evidence. They've dealt with those issues. Are we going to treat them, or are we going to let them develop from F2 to F3 to F4? But apparently they are being, you know, under the January 2019 protocols, which is only November right now, they're entitled, certainly if they're at the F3 level, even the F2 level, they say, the UIC people are reviewing to see what's appropriate. But that isn't what the protocol says. First of all, when we had the hearing in 2019, we were first given a protocol. And when the medical director of the department was on the stand, he said, well, that isn't the one I did. Here's the one I did. So literally the week of the hearing for injunctive relief, they came up with this new plan. And the new plan doesn't promise treatment for anyone at any point in time. It talks about making referrals and then prioritizing and making recommendations for treatment. So what's wrong with deferring to the medical judgment of the doctors at UIC for this? Do you think you can actually write in, yes, you get treatment? Well, I think what the judge said was that if the doctors at UIC say that the standard of care, and there isn't any question about what the standard of care is. That testimony was absolutely clear. If the standard of care dictates treatment, then you'll treat. Not that you'll make recommendations for treatment. Not that you'll prioritize them and promise them they'll get treatment sometime. But you'll get treatment. This morning, if you look on the internet on GoodRx website, you can find a prescription for eclipsa for $3,600. You take that pill once a day for eight weeks, and you're 98% chance of being cured. And yet, they'll make a recommendation that maybe you'll get that treatment. When will you get it? Will you go to fibrosis level three before you get it? Will you die? Will you go on the organ transplant list? And you're right, Your Honor. Once you're on the list, you're finished because you're not going to get an organ transplant in the Department of Corrections. It's a death penalty. And 120 people have died. And we need to say, I agree with Mr. Crutch. We need to get down to business and treat these folks. But don't we need more facts about how the class representative matches up with this? Did the people who die have F4 levels of fibrosis? I would imagine so. They have liver failure. I mean, what do they look like compared to the others? And I'm not sure I agree with you that the evidence is uncontested about how to treat. There's certainly evidence I saw indicating that it's a slow-progressing condition. For some people, they can go decades, and they're all right. For other people, they're less fortunate, and they are in bad shape sooner. But you don't know, and I don't know, and the doctors can't tell us which of the patients was Hep C that would be. So if you have Hep C and you think, well, I'll just wait, you're playing Russian roulette. But why doesn't the testimony that I read, you can certainly correct this, indicated that if you take a wait-and-see approach at F1, but then when it moves to F2, you say, okay, now this is moving. Let's refer to UIC and see if we need a more aggressive intervention. That's okay. All of the testimony in January of 19, all of that testimony was clear that, number one, first of all, it's more cost-effective to treat early than it is to wait. You actually save money if you treat early. Number two, that even at F0 and F1, people who do not get treatment lose life expectancy faster than people who do get treatment. So they are dying faster every day as a result of the fact that they have this progressive disease going on in their body and it's not being treated, and you can treat it with a pill. Further, we don't know who's going to progress at what rate, so you are taking a chance. And the doctors identified numerous extrahepatic complications that arise from the failure to treat Hepatitis C. At page 96 of one of the sub-reports in Lippert, it's on page 474 of the PDF file that's contained by the court, the court's expert says, it is the best interest of the patient population, the institution, and the non-incarcerated community to treat all patients with Hepatitis C. It is impossible, he said, to clinically and legally justify waiting for patients to develop cirrhosis before initiating treatment. Now, F0 means there's no scarring at all, but F1 means the disease has started to destroy your liver. It has already started and it's measurable. So to say that there's no harm at F0 or F1 is inconsistent with the medical testimony that we heard in this case. It's inconsistent with what Lippert says. It is impossible to clinically and legally justify waiting for patients to develop cirrhosis before initiating treatment. That's what the court's expert said. That's the report. That's the court's expert, certainly not the only expert testimony in this record. But there were no experts that testified in January of 19 to the contrary. There was testimony in the 17 hearing. In the 17 hearing, yeah. About that, that it was a good idea to wait. And long ago, there were lots of reasons to wait because the interferon had such horrible side effects and it was expensive. And so they waited and balanced. But you take a pill a day with almost no side effects and a 98% chance of cure. So your position, though, is really if the Department of Corrections adopts any protocol other than the optimal one, it's violating the Eighth Amendment. No, ma'am. I'm not suggesting that at all. But I'm suggesting that to adopt a protocol that never guarantees treatment, that has no ability for the inmate to inform. What do you do under that protocol if you're F2 and you've been sitting there for six months and UIC? Are you presuming, though, that the UIC doctors would commit malpractice if they diagnosed somebody as F3, for example? U of I doctors don't have the right to prescribe the medicine. They make recommendations under this protocol back to the Department of Corrections, and then they make a decision as to when and where to treat you. I thought they did, and I thought the medicine was, like, overnighted down to the and then the Wexford people would test. Once you're qualified to receive the treatment, then UIC is going to obtain the medicine and ship it. So that's not what you just said. You said they can't prescribe. They don't. They don't get to make the decision when it's your turn to get the medicine. The Department of Corrections still retains that under this protocol, and there's no guarantee that you'll ever get it. There's no remedy. You can't go in and ask for a rule to show cause because you haven't been treated. You just wait your turn. Well, I understand that there's a monitor in the Lippert degree. I mean, I recognize that this case is much more focused on Hep C, and Lippert was about actually quite a bit of different things. I'm not sure that my understanding of what this 2019 protocol is is as bleak as yours. I think that, I mean, isn't it there are these telemedicine conferences between the particular inmate and the UIC doctor, and the UIC doctor can say you need the pill, so to speak. They send it to the prison. I don't understand in this protocol that Wexford can just then decide, okay, we have 15 pills. Who are we going to give it to? But if you look at the protocol, nowhere in that protocol can you put your finger on something that says you will get treated and here's when you'll get treated. It's just not in there. It isn't, and that's why the judge tweaked it because, as he said at the hearing, he said, you know, just because you tell me you've got the protocol doesn't mean you'll do it. That's been the history for 11 years, that they have these protocols. They have rationale for treatment, but yet we have people who do grievances, who get rubber stamped and say you're not going to get treated. They just don't treat people. And one of the suggestions I made in my brief, and you can think about it if you are inclined to do so, but one of the options would be to simply consolidate this case into Lippert. Class is the same, or at least we're a subset of that class. I think by definition all of my clients are, or at some point were, a member of that class. The other interesting fact is that this case is not the only non-Lippert case with the Department of Corrections and their failure to properly treat. I know they've got the mental health case out of Peoria as well. So this isn't the only area of medicine where Lippert wasn't inclusive enough such that the judge who heard the case felt compelled to enter some kind of relief because the history of the treatment that the people with hepatitis C have gotten in the Department of Corrections over the last 11 years is really bad. Well, I'm not going to disagree with you about that. The Department of Corrections has not always covered itself with glory, but we are looking at this case. I think we're looking at the January 2019 protocol. I'm looking at least at the way the state describes it, and what they say is relying on Durley's testimony that once a UIC physician prescribes treatment for an inmate, like a person, an individual, the UIC pharmacy sends the medication to UPS to the department's prison. So I just can't read in that that it's not designated for the inmate who is in question. But that isn't, if you read the protocol itself, that isn't what happens. That isn't what the protocol calls for, and there's no designation as to when they have to say, okay, fine, send that prescription, or when they have to give it to the plaintiff. The whole point of the injunctive relief was simply to do what Mr. Ripp suggested we do, and that is get down to business. We can talk about procedural niceties lots and lots of times, and we can craft the order, but the long and the short of it is we need some clear direction that we'll treat people. That is that it's not okay to let them die. It's not okay to let them go to fibrosis level three and four. That after a certain period of time, they get the medication that they need. Maybe it's four months instead of three. Maybe it's six, and you talked about the telemedicine, but if, again, if you note the Lippert, they only do that twice a year. This isn't like if you're sick, you go and you see a doctor twice a year. They have these telemedicine clinics. That's not exactly monitoring a situation that gets progressively worse. Is that in the record? It is. It's in the Lippert report on numerous occasions that these telemedicine chronic clinics are twice a year, and when we asked the medical director at the Department of Correction, when he was on the stand in January, his response is, I don't know. He didn't even know how often his chronic clear, the question was clear. Isn't it true these are only twice a year? I don't know, and that's the response we got to a lot of these issues. They don't know, and they won't provide the care, and Judge Baker finally said, look, 18 months ago, I told you to treat people as soon as possible. Now, what does that mean if all you have to do is order a pill? As soon as possible, and 18 months later, the day, the week before the hearing, they say, oh, okay, well, we'll come up with this new protocol, but no guarantees as to when they'll treat, and you don't hear them in here saying we've treated everybody stage 2 and above, and it's been 11 months, and we still haven't treated stage 2, but that's what their protocol, if you think it's the way you suggest, they could have treated everybody by now, and it really would have made the matter move, but you don't hear them standing before this court and said, we've already treated everybody F2 and above, so we don't need an injunction. Thank you. Okay. Thank you very much. Ms. Chenevert. Your Honors, I have just a few points on rebuttal. I'd first just like to respond to Mr. Heller's point about not knowing which inmate will progress and at what rate, but the inmates, once they have been diagnosed with hepatitis C, they're enrolled in the chronic care clinic where they're seen every six months to track the disease and to determine if it has progressed, and if so, then refer the inmate to UIC. So the chronic care clinic is inside the prison run by Wexford, and then there's this telemedicine thing with UIC, the next step? Right. The telemedicine program is where the inmate is able to speak with the physician from UIC, and that leads me to my next point. So that's every six months too, or how is that doled out? I believe in the LIPR report, I believe there was reference to the telemedicine clinic occurring every six months. So how does that work? So is it like they're a day, and every inmate, all these 2,000 inmates with hep C, have to somehow squeeze in a couple of minutes out of a day every six months, or how does that work? In truth, Your Honor, I'm not entirely sure exactly how it works as far as when the inmate is referred to the telemedicine program and when that's set up. I will say, however, to the extent that there are any issues or problems, again, with the telemedicine program and how it's run or how frequently it's run, again, that is something that will be reviewed by the monitor, the court-appointed monitor in LIPRT. And I would also just point out what Mr. Heller is, I think, concerned about is that there's no individual right for an inmate, let's say who's progressed to F3 or possibly worse, to just get in there and say, you're under a court order to give me treatment, give me treatment now, or I'm going to go back and seek a contempt order. If an inmate has reached F3 or is in need of treatment, the sick call process is always available to the inmate. They can submit a request to be seen by any of the prison doctors. So this is still in Wexford, okay. And, again, I would also just note, I see my... You can finish up. As to the information contained in the LIPRT report regarding delays or problems with treatment of hepatitis C, I would note that those were all under the prior protocol. They did not involve the most recent January 2019 protocol entered by the department. And for those reasons, we ask that this court vacate and remain the portions that grant your preliminary injunctive relief. Thank you. All right. Thank you very much. Thanks to all counsel. We'll take the case under advisement.